## KRICK ET AL. *v.* DOUGHERTY

\* \* \*

## DOUGHERTY *v.* KRICK ET AL.

[No. 361, September Term, 1971.]

*Decided June 14, 1972.*

*Motion for rehearing filed July 10, 1972; denied September 11, 1972.*

The cause was argued before HAMMOND, C. J., ▮ and BARNES, MCWILLIAMS, SINGLEY, SMITH and DIGGES, JJ., and RICHARD P. GILBERT, Associate Judge of the Court of Special Appeals, specially assigned.

*Richard A. Brown* and *Edward C. Mackie* for Frank Krick and Mildred Krick, appellant and cross-appellee.

*Paul S. Beatty,* with whom were *Isaac Hecht, Leroy Handwerger* and *Hecht & Handwerger* on the brief, for John H. Dougherty, Jr., appellee and cross-appellant.

BARNES, J., delivered the opinion of the Court.

This appeal contains three appeals in one record. The

principal questions presented to us are whether the Circuit Court for Anne Arundel County, in Equity (Wray, J.), (1) in its decree of October 18, 1971, properly granted specific performance of a contract resulting from the exercise by the appellee, John H. Dougherty, Jr., plaintiff below and cross-appellant, of a written option, dated May 21, 1969, whereby Frank Krick and Mildred Krick, his wife, appellants, defendants below and cross-appellees, and Walter C. Hoerl and Bertha Hoerl, his wife, trading as "Whitey & Walt's Tavern," granted Dougherty the option to purchase a tavern in Anne Arundel County and (2) whether the chancellor erred in declining to enforce an alleged settlement agreement dated November 4, 1970. Dougherty also contends that the chancellor erred in overruling his demurrer to the Amended Answer of the Kricks and in declining to consider Dougherty's petition for a review of the decree filed after the entry of the order for appeal by the Kricks but prior to the enrollment of the decree. The Hoerls were defendants below but did not appeal to this Court from the decree of October 18, 1971.

Dougherty's mother was married to Hoerl, who was employed by a gas conversion company. As part of his duties, he moved from town to town as each job was completed. Mrs. Hoerl became tired of moving from town to town. In order to provide his stepfather with a local business, Dougherty and Hoerl looked for and discovered, as a potential local business, a property of approximately one acre and improvements located at 3 Ritchie Highway, Anne Arundel County, then owned by the Third District Women's Democratic Club (the subject property). This club not only owned the subject property but held an Anne Arundel County liquor license.

Dougherty knew that his stepfather, Hoerl, had never been in business for himself and was not familiar with the operation of a tavern business. He thought that Hoerl should have a partner who was familiar with such an operation and, having known Krick for a number of

years as a person who had been in the tavern business most of his adult life, introduced his stepfather to Krick in 1961. As a result of this introduction, Hoerl and Krick formed a business partnership to operate "Whitey & Walt's Tavern." The partnership leased the subject property from the Club with an option to buy it.

Toward the end of the first lease period, Dougherty advised the partners to purchase the subject property. He requested The Laurel Building Association of Prince George's County, located in Laurel, Maryland (Building Association), where Dougherty owns and operates a pharmacy, to appraise the property to ascertain whether the Building Association could arrange financing for the partners to purchase the property. This financing was arranged and the partners exercised their option to purchase the property in 1964.

From 1964 to 1967 the partnership apparently did not experience any financial problems. In 1967, however, payments on the mortgage on the subject property were not made when due; and in April of 1968 the Building Association made a tentative decision to foreclose the mortgage on the subject property. Officials of the Building Association notified Dougherty of the financial difficulty prior to instituting foreclosure proceedings.

Dougherty then conferred with both of the partners, Krick and Hoerl, and told them to straighten out the matter with the Building Association as soon as possible, which they did. In May of 1969, however, payments were late again and the Building Association decided to institute foreclosure proceedings. Thereafter, Dougherty requested the Building Association not to foreclose and to give him a week's time to talk to Krick and Hoerl in an effort to straighten the matter out. The Building Association agreed not to foreclose if Dougherty would see to it that the Association was paid.

In order to prevent the foreclosure in May 1969, Dougherty called Krick and Hoerl to his home on May 10, 1969, to discuss and hopefully to resolve their finan-

cial crisis. At this conference Dougherty determined how much of the indebtedness of Krick and Hoerl would have to be paid immediately. This amounted to approximately $4,000.00, including the back payments on the mortgage. Dougherty told Krick and Hoerl that if they wanted him to resolve their present financial difficulties, they would have to grant him an option to buy the business and the subject property. Dougherty presented them with a form of option he had prepared with a blank space for the insertion of the amount of the purchase price. An agreement of $65,000.00 for the purchase price was reached and this figure was inserted in the blank in the form of option agreement. Dougherty testified that the $65,000.00 figure was broken down as $30,000.00 for the business and subject property (this was the amount of the original purchase price by Krick and Hoerl), $20,000.00 for the inventory, $10,000.00 for fixtures and equipment and $5,000.00 for good will. Krick broke the $65,000.00 figure down as follows: $35,000.00 for the mortgage, $10,000.-00 for the stock and $20,000.00 for the fixtures. Krick and Hoerl read the proposed option; and the figure of $65,000.00 was inserted, the partners placing their initials over the inserted amount. They then signed the completed option on May 10, 1969.

The written option of May 10, 1969, was as follows:

"In Consideration of the sum of $1 dollar ($1.00), cash in hand paid, receipt of which is hereby acknowledged, we hereby give and grant unto John H. Dougherty, Jr., his heirs, assigns, or representatives, the exclusive option and right to purchase, for a period of three (3) years from the date hereof, upon the terms and conditions set out hereinbelow, the following-described land in Anne Arundel County, State of Maryland, to wit:

Being the west side of Ritchie Highway, in Elvaton, Maryland, more specifically described as the Frank Krick and Walter

Hoerl property, commonly called Whitey's & Walt's. This option includes property, all improvements, stock, fixtures, licenses, etc. pertaining to the aforementioned property.

F.M.K.  W.C.H.

"Purchaser is to pay a total consideration of $65,000 Dollars ($65,000.00) payable in cash at the time of consummation of purchase.

"Upon exercise of this option, the sale of said land, as contemplate[d] hereby, shall be consummated with[in] ninety (90) days from the date of delivery of notice of such exercise.

"We agree to deliver to purchaser a good and sufficient warranty deed conveying said property in fee simple to the purchaser, or his assigns or representatives, contemporaneously with delivery by purchaser of the consideration as set out in paragraph one.

"Witness in duplicate this 10 day of May, 1969:"

After the conference, Dougherty assured the Building Association that it would be paid and that he had been granted a written option to purchase the business and subject property from Krick and Hoerl. Dougherty also arranged for a $4,000.00 loan from the Citizens National Bank for Krick and Hoerl, Dougherty and his wife signing as guarantors of the note evidencing that loan.

Later Dougherty was advised by a friend who was a member of the Bar of Maryland that if the subject property was titled in the names of the Kricks and Hoerls, the option to purchase should be executed by all of them and not merely by Krick and Hoerl and that he would be glad to have his secretary retype the option to provide for the signatures by the Kricks and Hoerls. This was done. The language of the retyped option is substantially identical in wording to the option of May 10 but with

places for the four signatures and the addition of "(Seal)" after each signature. Dougherty then told Krick and Hoerl that if they and their wives would sign the proposed retyped option, he would co-sign the Citizens National Bank note and that the Bank would only loan Krick and Hoerl the $4,000.00 if Dougherty co-signed the note. Krick and Hoerl and their respective wives executed the option to purchase on May 21, 1969, under seal, before a witness and acknowledged it before a notary public as their act. Krick then took the executed option of May 21 to Dougherty and Dougherty gave Krick the $4,000.00 check from the bank. The money from this check was used by Krick and Hoerl to bring the mortgage up to date and to pay other partnership debts.

Later, Dougherty obtained an accountant for Krick and Hoerl to help them establish proper business records and instruct them in how to keep them. All of Dougherty's efforts to help Krick and Hoerl were unavailing, however, and in 1970 they again became delinquent in paying their retail sales taxes, in making their required mortgage payments to the Building Association and in making their payments to the bank on the note. The Building Association was about to foreclose and the Bank indicated that it wished Dougherty to pay off the balance of the note. Krick and Hoerl, since no bank would give them a checking account, had to pay cash in order to obtain any deliveries of liquor. Krick and Hoerl closed the business voluntarily for a time during the early part of 1970. In view of the situation, Dougherty decided to exercise his option to purchase of May 21, 1969.

The Kricks on April 30, 1970, received Dougherty's written exercise, under seal, of the option of May 21, 1969. Dougherty, when he exercised the option, offered $65,000.00 to Krick and Hoerl. The Kricks and Hoerls, however, would not convey the subject property, fixtures, stock and liquor license to Dougherty.

Dougherty, on May 13, 1970, filed a bill of complaint in the Circuit Court for Anne Arundel County, in Equity,

praying for specific performance of the agreement to purchase resulting from his exercise of the option of May 21, 1969, and for other relief.

The Hoerls did not answer the bill of complaint; and on June 23, 1970, Dougherty obtained a decree pro confesso against them. The Kricks, however, answered the bill of complaint denying that they had granted an option to Dougherty and that Dougherty had orally notified them of his exercise of the option on April 24, 1970.

The trial of the case was scheduled for November 4, 1970. The day before the scheduled trial—November 3, 1970—the Kricks and Dougherty agreed to try to settle the matter and had the case passed for settlement. Dougherty, in order to avoid additional costs of litigating the question of the validity of the option of May 21, 1969, was willing to pay $8,000.00 in addition to the $65,000.00 payable to Krick and Hoerl under the contract to purchase resulting from the exercise of the option and have the partnership pay the additional $8,000.-00 to Krick. According to Dougherty, the settlement of the suit was to have been consummated after the transfer of the liquor license was approved. This occurred in December 1970 but Krick would not settle because he wished to deplete the alcoholic beverage stock during the Christmas season. Dougherty was still willing to settle and he and the Kricks again agreed to try to settle the suit sometime during the first week in January 1971. In the early morning of January 4, 1971, however, a fire occurred at the subject property and completely destroyed the premises, together with all stock and fixtures. At the time of the fire, Krick and Hoerl had fire insurance coverage on the building and its contents, the alcoholic beverages covered having a then wholesale value of approximately $8,500.00.

After the fire, Dougherty was still willing to go forward with the proposed settlement if the Kricks would agree that Dougherty was to receive the proceeds of the fire insurance policies in lieu of the burned improvements

and stock; but the Kricks were no longer willing to go forward with the sale.

Prior to the trial of the case in the lower court on May 4, 1971, Dougherty had to pay the balance of the $4,000.00 loan from the bank.

After the case came on for trial on May 5, the chancellor granted the Kricks leave to amend their Answer. On June 1, 1971, the Kricks filed a Supplemental Answer alleging that the option agreement Dougherty was seeking to enforce specifically was invalid but, if found to be valid, was superseded by an agreement of settlement entered into on November 4, 1970, between Dougherty and Krick whereby in settlement of the suit Dougherty would pay Krick only an additional $8,000.00 in settlement of all claims arising out of the suit. The Supplemental Answer then continued:

> "Wherefore, the Defendants pray:
> (1) That the Option Agreement be declared null and void;
> (2) That the Court refuse to decree specific performance of the Option Agreement;
> (3) That in the alternative, the agreement of November 4, 1970 be specifically enforced;
> (4) That the Plaintiff pay the costs of these proceedings;
> (5) That the Defendants have such other and further relief as the case may require."

By an order dated July 21, 1971, the Kricks' Supplemental Answer was marked "Amended Answer."

Dougherty, on August 4, 1971, filed a demurrer to paragraphs 4 and 5 (in regard to the alleged superseding settlement agreement) and to prayer for relief No. 3 (seeking specific enforcement of the alleged settlement agreement) on the grounds that these paragraphs and prayer for relief alleged a counterclaim and were not an answer to the bill of complaint and that paragraphs 4 and 5 failed to allege that the Hoerls were parties to the alleged novation agreement.

The chancellor on October 18, 1971, filed an opinion in which he concluded that the alleged settlement agreement was "brought to naught when the fire occurred and Krick refused to relinquish the insurance proceeds" and that Dougherty was "entitled to specific performance of his contract, the insurance proceeds substituting for the burned premises and stock." The decree of October 18, 1971, was as follows:

"That the Plaintiff's Demurrer be, and it is hereby, overruled;

"That the Defendants be, and they are hereby, directed to perform their obligations under the option contract of 21 May 1969;

"That the Defendants pay the costs of these proceedings."

The Kricks entered their order of appeal to this Court on November 4, 1971, from the decree of October 18. On November 12, Dougherty filed a petition for revision of the decree of October 18, alleging that although the chancellor in his opinion stated that Dougherty, as the plaintiff, was entitled to the insurance proceeds in lieu of the burned premises and stock, the decree of October 18 merely provided that the defendants were to perform their obligations under the option contract without any direction that the plaintiff, Dougherty, was to receive the land, premises and stock free and clear of any mortgages or other liens, although the prayer for general relief would cover such a ruling by the chancellor. It was further alleged that counsel for Dougherty, on or about November 1, 1971, had received a letter with an enclosed Assignment Agreement from an officer of the Building Association, indicating that the six insurance companies insuring the premises against loss from fire had denied all liability to the Kricks and Hoerls, trading as Whitey & Walt's Tavern, and had paid the balance due under the mortgage on the subject property of $29,324.28 and had received an assignment of the mortgage, the payment in no way admitting liability to the Kricks and

Hoerls.[1] The lower court, as well as Dougherty, did not know of the denial of coverage to the defendants when the decree of October 18 was passed. Paragraph 6 of the petition recites:

"6. That although this Court's Memorandum of Opinion specifically provided that the insurance proceeds would substitute for the burned premises and stock, said Opinion and Decree did not provide for the contingency that coverage may be denied to Defendants, and, therefore, if there were no insurance proceeds, whether or not to allow Plaintiff a pecuniary compensation or abatement from said purchase price, said compensation or abatement being the equivalent in value of the burned premises and stock."

The prayers for relief in the petition were:

"(1) That this Court revise its Decree of October 18, 19[71] before November 17, 1971 in order to provide for:

(a) Plaintiff to receive said land, premises and stock free and clear of any mortgages, liens, etc.; and (b) for a pecuniary compensation or abatement from said purchase price, if there are no insurance proceeds in lieu of the burned premises and stock;

---

1. The insurance companies involved, the policy numbers, the total coverage of each policy, the percentage of contribution for the acquisition of the mortgage and the amount of the contributions are as follows:

| Company | Policy Number | Total Coverage | Percentage of Contribution | Amount of Contribution |
|---|---|---|---|---|
| Aetna Ins. Co. | 00 92 80 | $11,000.00 | 17.46 | $ 5,120.02 |
| Fireman's Fund Ins. Co. | F 442-30-85 | 12,000.00 | 19.05 | 5,586.28 |
| Glens Falls Ins. Co. | F 09 10 61 | 6,000.00 | 9.52 | 2,791.67 |
| St. Paul Fire & Marine Ins. Co. | 181AA 6700 | 10,000.00 | 15.87 | 4,653.76 |
| U.S.F. & G. Co. | F 2275961 | 14,000.00 | 22.22 | 6,515.85 |
| U.S. Fire Ins. Co. | 80 30 52 | 10,000.00 | 15.88 | 4,656.70 |
| | | $63,000.00 | | $29,324.28 |

"(2) that this Court grant hearing to Plaintiff before the 17th day of November, 1971;

"(3) that this Court revoke its Decree of October 18, 1971 before November 17, 1971;

"(4) that this Court order that the record in this case not be forwarded to the Court of Appeals until after it revises said Decree; and

"(5) that Plaintiff may have such other and further relief as the nature of his Petition may require."

The chancellor on November 15, 1971, filed an order declining to consider the petition for revision of the decree of October 18 inasmuch as the lower court was of the opinion that it was without jurisdiction.

Dougherty entered an appeal to this Court from the order of November 15, 1971, the following day—November 16, 1971—and later the same day entered an appeal to this Court from the decree of October 18, 1971.

## (1)

In our opinion, the chancellor properly concluded that the contract to purchase the subject property and business resulting from the exercise by Dougherty of his option of May 21, 1969, should be specifically enforced. The language of the written contract was clear and unambiguous and the Chancellor properly found that there was no overreaching or other inequitable conduct on the part of Dougherty in negotiating the option. The Kricks contend that the *exercise* of the option was subject to two oral conditions precedent, not made part of the written option, *i.e.*, that the option would only be exercised by Dougherty if the partners (1) "failed to make a success of the business" or (2) failed "to run [the business] in a good business-like manner." They further contend that inasmuch as these "conditions precedent" were part of the original consideration for the contract and were part of the inducement to enter into the option, parol evidence is admissible to establish them as valid and binding on the parties, relying upon the decisions of this

Court in *Alban Tractor Co. v. Harrison,* 228 Md. 632, 180 A. 2d 862 (1962) and *Leonard v. Union Trust Co.,* 140 Md. 192, 117 A. 318 (1922). They also contend that the language of the alleged oral "conditions precedent" is not so vague and indefinite as to have no meaning and that Dougherty had not met his burden of proof to show a failure to "make a success of the business" or to run it "in a good business-like manner."

Even if we assume, *arguendo,* that the language of the alleged "conditions precedent" is sufficiently definite to be enforced and further that the alleged "conditions precedent" could be established by admissible testimony in view of the parol evidence rule and the provisions of the 4th section of the Statute of Frauds, nevertheless the record amply establishes that the partners did indeed fail to make a success of the tavern business and to operate it in a good business-like manner. As we have already observed, the partners had again become delinquent in 1970 in paying the retail sales taxes, in making the mortgage payments to the building association and in making the loan payments to the bank. The Building Association was about to foreclose and the Bank wanted Dougherty to pay the balance of the note. Krick and Hoerl had no checking account; no bank would give them a checking account and they had to pay cash for all liquor deliveries. They had closed the tavern for a period and were in danger of losing their liquor license. Under these circumstances, the alleged oral "conditions precedent" were satisfied prior to the exercise of the option by Dougherty who was then on any theory entitled to specific performance of his contract to purchase.

### (2)

Krick contends that the contract based upon the exercise by Dougherty of the option of May 21, 1969, was superseded by an alleged agreement of settlement of November 4, 1970. As we have indicated, there was an attempt to settle the pending litigation and the case was passed for settlement when it was to have been heard

on November 4, 1970. There was an exchange of letters between counsel on November 4, but it does not appear that an agreement on the precise terms of the proposed settlement was reached. For example, in the letter from counsel for Dougherty, the purchase price in the contract to purchase resulting from the exercise of the option was to be increased from $65,000.00 to $73,000.00 so that *the partnership* would receive the entire purchase price and thereafter pay Krick $8,000.00 in consideration of his withdrawing his defense in the pending litigation. The letter from counsel for Krick, on the other hand, provided that Dougherty should pay Krick *only* the sum of $8,000.00 in settlement of all claims arising out of the law suit. Assuming, for the argument, that an agreement of settlement was reached, the time of settlement was not specified so that it would be within a reasonable time. *See* 15A C.J.S. *Compromise and Settlement* § 45, at 273, 274. *See also City of Baltimore v. Landay,* 258 Md. 568, 267 A. 2d 156 (1970).

Dougherty testified that settlement was to take place in December 1970 when the transfer of the liquor license was approved but that Krick declined to go to settlement then because he wished to dispose of a substantial portion of the alcoholic beverages on hand during the Christmas season. Dougherty testified that he was still willing to settle the first week in January 1971 notwithstanding Krick's refusal to settle in December 1970; but the fire having occurred on January 4, 1971, Krick declined to settle, being unwilling to turn over any insurance proceeds to Dougherty.

In any event, the Kricks in paragraphs 2 and 3 in their Amended Answer filed June 1, 1971, denied the validity of the option agreement with the plaintiff Dougherty and denied that he was entitled to specific performance of that agreement. They prayed, in their second prayer for relief, that the lower court refuse to decree specific performance of that agreement. Inasmuch as the withdrawal by the Kricks of their defense to the specific enforcement of the agreement in the pending litigation was the basis

for the alleged settlement, the election of the Kricks to press their objection to specific enforcement and their position that the option agreement was invalid indicated that they no longer considered the case settled. On the contrary, they took the position that the alleged agreement of November 4, 1970, superseded the original contract and that the *new* agreement should be specifically enforced. The chancellor properly ruled that the alleged agreement of November 4 was not a novation and hence did not supersede the original contract. As Judge Pattison stated for our predecessors in *District National Bank of Washington v. Mordecai,* 133 Md. 419, 427, 105 A. 586, 588 (1919):

> "A novation is a new contractual relation and contains four essential requisites: (1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution for it of the new one."

*See Leisner v. Finnerty,* 252 Md. 558, 563, 564, 250 A. 2d 641, 644 (1969), citing *Mordecai* with approval and quoting from it.

It is clear from both the pleadings and the evidence at the trial that the Hoerls were not parties to the alleged novation and hence the second element for an effective novation was not present. The alleged agreement of November 4, 1970, was neither a novation nor an enforceable settlement agreement; and the chancellor properly so ruled.

Dougherty earnestly contends that the chancellor should have considered his petition to revise the decree of October 18, 1971, even though it was filed after an appeal to this Court had been entered by the Kricks from that decree. The chancellor took the position that after the appeal was taken, the lower court lost jurisdiction in the suit and refused to consider the petition to revise. The prior decisions of this Court sustain the

chancellor's position. *Collier v. Collier*, 182 Md. 82, 32 A. 2d 469 (1943) and *Eastern States Corp. v. Eisler*, 181 Md. 526, 30 A. 2d 867 (1943).

Dougherty, however, is not without some relief in this Court inasmuch as he entered a cross-appeal from the decree of October 18, 1971. We have concluded that the chancellor erred in the form of the decree and the case must be remanded for the entry of a decree for specific performance in proper form. As we have already stated the chancellor in his opinion indicated that Dougherty was "entitled to specific performance of his contract, the insurance proceeds substituting for the burned premises and stock." There is, however, nothing in the decree in regard to this aspect of the matter; and this Court has held that the decree—and not the court's opinion—represents the official and effective action by the lower court. *Alleghany Corp. v. Aldebaran Corp.*, 173 Md. 472, 196 A. 418 (1938). The chancellor was apparently under the erroneous impression that the fire insurance proceeds had already been paid to the Kricks and the Hoerls. In any event, the decree should have delineated the details of the relief of specific performance with the usual provisions for a trustee in the event the sellers refused to execute the necessary documents.

For the guidance of the lower court upon the remand to formulate and file a new decree in proper form to effectuate the specific performance of the option contract of May 21, 1969, we will indicate our opinion in regard to the form of the decree, pursuant to Maryland Rule 885, in order to prevent, if possible, another appeal in this matter.

In our opinion, the position of the Kricks that, under the decisions of this Court, Dougherty is not entitled to the proceeds of fire insurance unless he is designated by endorsement on the policies as entitled to the proceeds as contract purchaser (which apparently is not the case) or unless the proceeds of the fire insurance policies had already been paid to the Kricks and Hoerls in which event they would hold the insurance proceeds as trustees

for the contract purchaser, Dougherty, is sound. Apparently, the fire insurance companies have denied liability to the Kricks and Hoerls and have thus far paid them nothing.

Our predecessors have decided the principles of law applicable in this situation in *Brewer v. Herbert,* 30 Md. 301 (1869) and in *Skinner & Sons' Co. v. Houghton,* 92 Md. 68, 48 A. 85 (1900). In *Brewer,* the improvements on the land subject to a contract of sale were destroyed by fire subsequent to the signing of the contract of sale but before the conveyance of the property. The fire insurance held by the vendor had lapsed prior to the fire. The vendor was granted specific performance and the vendee had to suffer the loss.

Judge Miller stated for the Court:

> "In contracts of this kind between private parties, the vendee is in equity the owner of the estate from the time of the contract of sale, and must sustain the loss if the estate be destroyed between the agreement and the conveyance, * * *."
>
> (30 Md. at 307.)

The Court later stated:

> "If the policy had existed at the time of the loss, the vendor could have recovered from the insurance company, but being trustee of the premises for the vendee, he would be bound in equity to account to the latter for the money so received * * *."
>
> (30 Md. at 313.)

*Brewer* was cited with approval in *Skinner, supra,* where the Court further stated:

> "In *Joyce on Insurance,* section 3525, it is said: 'If property is destroyed between the time of effecting the contract for the sale and delivery of the deed, the proceeds of an insurance policy

belongs to the vendor as between him and the company, but the former is held to act as trustee for the vendee and must therefore account to his *cestui que trust* in equity.' "
(92 Md. at 88; 48 A. at 88.)

We have never departed from these holdings so that Dougherty is not entitled to any proceeds of the fire insurance in this suit in the absence of the conditions already set forth, which, as we have stated, apparently do not exist.[2] We do not indicate any opinion in regard to what rights, if any, the parties to this suit may have against the fire insurance companies, they not being parties to this litigation.

We are of the opinion, however, that in the decree to be formulated upon the remand, Dougherty is entitled to have the subject property conveyed to him by a good and sufficient deed conveying it "in fee simple" as the contract provides. This means that the subject property is to be conveyed free and clear of any subsisting mortgage and other liens so that Dougherty is entitled to an abatement of the purchase price of $65,000.00 in an amount necessary to pay off any subsisting mortgage or other liens if they have not been paid off and released at the time of settlement. Apparently, the subsisting mortgage has been purchased by and assigned to the six fire insurance companies for $29,324.28. Additional interest will likely have accrued subsequent to the assignment to those companies. Whatever proper total amount is required to obtain the release of this mortgage, that amount is to be abated from the purchase price if the mortgage is not released of record at or prior to settlement.

### (3)

Dougherty contends that the chancellor erred in re-

---

2. Dougherty, as contract purchaser, after the exercise of the option on April 24, 1970, could have protected his interest as the then equitable owner of the subject property by an appropriate endorsement on the fire insurance policies or by the obtention of his own fire insurance policies to protect his interest.

fusing to sustain his demurrer to paragraphs 4 and 5 and prayer 3 of the Amended Answer of the Kricks and by his order filed July 22, 1971, in denying his motion ne recipiatur or to strike the Amended Answer. The thrust of his argument on the demurrer was that the Kricks had not alleged the necessary elements of a novation. In regard to the motion, he urged that the Kricks had not applied to the lower court for leave to file a supplemental pleading as required by Rule 379 and, further, that the Kricks were seeking to assert a counterclaim in their "Amended" Answer without complying with the Rules applicable to filing counterclaims. There is much force in these contentions; but in view of our decision on the merits, these rulings, even if erroneous, were not prejudicial to Dougherty, so that we do not deem it necessary to rule upon the propriety of the chancellor's rulings on the demurrer and on the motion.

> *Decree of October 18, 1971, reversed and the case remanded to the lower court for the formulation and entry of a decree in accordance with this opinion, the appellants and cross-appellees to pay one-half of the costs and the appellee and cross-appellant to pay the remaining one-half of the costs.*